IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE BARTULICA, | ) | Case No. 3:20-cv-267 |
| | ) | |
| Petitioner, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| KAREN VOLZ[1], | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |

On August 8, 2015 George Bartulica brought a knife to a fight outside a bar in Vermilion, Ohio.  A woman who tried to stop him from pushing her friend suffered a deep cut to her arm.  A jury decided Bartulica's wielding of the knife was the cause of the injury and found him guilty of felonious assault.  Despite the second-degree felony verdict and a presumption for prison, Bartulica was sentenced to a five-year period of community control.  Saddled with a felony record, however, Bartulica comes to our court with two claims for habeas corpus relief under 28 U.S.C. § 2254 (ECF Doc. 2): (1) there was insufficient evidence to convict him; and (2) the trial court violated Bartulica's due process rights when it allowed an unqualified police sergeant to offer expert opinion testimony about the source of blood on Bartulica's shirt.  Respondent Karen Voltz is Bartulica's probation officer.  Her return of writ (ECF Doc. 6) asserts that Bartulica's evidence sufficiency claim fails on the merits and that his expert witness claim is noncognizable.

---

[1] Respondent filed an answer and return of writ in which her last name was spelled Voltz.

In their follow up briefs, Bartulica and Voltz debate finer points of Ohio evidence law concerning the allowable breadth of police officer testimony.

Bartulica's evidence sufficiency claim is argued in two sub claims: (i) whether there was evidence to prove that his knife was a deadly weapon, and (ii) whether there was evidence that Bartulica acted knowingly.  I find that we don't have jurisdiction to consider the first; and the second fails on the merits.  I further find that his police officer testimony claim is noncognizable. I recommend that both claims be DISMISSED and that Bartulica's petition for writ of habeas corpus be DENIED.

I.      **Procedural History**

A.      **Trial Court**

On September 10, 2015 an Erie County, Ohio grand jury issued a four-count indictment against Bartulica.  ECF Doc. 6-1 at 1.  Count One alleged that Bartulica knowingly caused serious physical harm to Leanna Griebe; Count Two alleged that he caused physical harm to her by means of a deadly weapon.  The grand jury specified that Bartulica caused or threatened to cause physical harm during the commission of the felonious assault alleged in Counts One and Two.  Count Three charged him with misdemeanor assault and Count Four charged him with evidence tampering.  After Bartulica's not guilty plea, the case proceeded to jury trial.  The jury found Bartulica guilty on all counts and specifications.  ECF Doc. 6-1.  On October 13, 2017, after merging the Count Two felonious assault charge with Count One, the trial court sentenced Bartulica to serve a five-year period of community control on the Counts One, Three and Four. ECF Doc. 6-7.

**B.      Direct Appeal**

On direct appeal, Bartulica, through new counsel, raised four assignments of error:

(1) there was insufficient evidence for the convictions; (2) the convictions for felonious assault

and evidence tampering were against the manifest weight of the evidence; (3) the trial court erred

in permitting expert testimony from an unqualified police sergeant and without proper

foundation; and (4) the prosecutor's comments during closing argument violated Bartulica's

right to a fair trial.  ECF Doc. 6-9 at 2-3.  The Ohio Court of Appeals affirmed Bartulica's

convictions on September 28, 2018.  *State v. Bartulica*, No. E-17-065, 2018-Ohio-3978 (Sixth

Dist. App.); ECF Doc. 6-11.

Through his appellate counsel, Bartulica appealed to the Ohio Supreme Court.  ECF Doc.

6-12.  He raised two propositions of law: (1) a defendant is deprived of due process of law and a

fair trial when a witness offers scientific testimony without proper qualification or proper

foundation, in violation of the applicable rules of criminal procedure and the Ohio Rules of

Evidence; and (2) "eliminating essential elements of an offense violates a defendant's

constitutional rights to due process of law."  ECF Doc. 6-13 at 2.  The state did not file a brief.

The Ohio Supreme Court declined to accept jurisdiction of the appeal on February 6, 2019.  ECF

doc. 6-14.  Bartulica did not appeal to the U.S. Supreme Court.

**C.      Federal Habeas Corpus**

On February 7, 2020, Bartulica, through his direct appeal counsel, filed his habeas corpus

petition in this court.[2]  He presents two claims for relief:

> **Ground One:**   The convictions are not supported by sufficient evidence in
> violation of Petitioner's constitutional right to due process of law
> under the United States Constitution.

---

[2] Bartulica initially filed his petition on February 6, 2020 but not in a format that met the requirements of
the local rules of court.  The amended petition was filed the next day.

**Ground Two:**   Petitioner was deprived of his constitutional rights to due process of law and a fair trial as result of the improper admission of prejudicial testimony.

ECF Doc. 2 at 5, 7.  Respondent Voltz asserts that the Ground One claim fails on the merits. And she argues that the Ground Two claim, raising only an issue of state law, is noncognizable in a federal habeas case.  ECF Doc. 6.  Bartulica's traverse offered no further argument on the Ground One claim; but he restated his arguments on Ground Two, adding that he was denied a fair trial by the surprise expert testimony of the police sergeant, which was admitted with no qualification of the expert or any proper foundation having been laid.  ECF Doc. 7.  Without leave of court, Respondent Voltz replied to Bartulica's traverse which restated her arguments. ECF Doc. 8.

## II.    The Facts

We begin analysis of Bartulica's petition by reciting the facts as they were set out in the state court of appeals opinion.  In its summary of the trial evidence, that court said:

> {¶ 4}   Kory Herchler is a regular at Rudy's Bar & Grill. Leanna Griebe is one of Kory's best friends. Late in the evening of August 7, 2015, Kory and Leanna went to Rudy's with two of Kory's brothers. A short time before "last call" Kory's brother called a cab. Leanna went outside and sat on a bench in front of the bar to wait for it. When Kory saw Leanna outside, he went out and sat next to her.

> {¶ 5}   A few minutes later, a man later identified as appellant, walked out of the bar. Kory and appellant got into a "scuffle." Leanna tried to break it up.

> {¶ 6}   At trial, Kory testified: "I don't know what was said or what provoked me to stand up, but I stood up." After Leanna pushed appellant away from Kory to break up the scuffle, Kory noticed blood on Leanna's arm. Kory explained:
> [S]he turns to me, Leanna, and says, oh Kory, you know, this horrified look on her face, and her arm is sliced open on — on her forearm.
> At that rate, I, you know, grabbed her, grabbed her arm, tried to keep her calm in that situation, although not the calmest situation.
> At that rate, Derrick Dillon, the bouncer, must have, you know, seen us out there, ran out with a towel. We wrapped her arm. My twin brother comes out and, you know, I was holding Leanna, and then I don't do well in those

4

situations, so at that rate he, you know, kind of takes over for me as the placeholder of maker her — or making sure she stays calm. Again, I am not calm, clearly, in these situations. So I just kind of like kind of removed myself from it. He is then tending to her.

{¶ 7}   Kory never saw a knife or any type of weapon in appellant's hand. He denied having any kind of weapon in his own hand during his confrontation with appellant. Kory insisted that at the time of the altercation, he, appellant, and Leanna were the only people outside the bar. Kory testified that he had never met appellant before the incident nor did he recall seeing appellant inside the bar earlier that night.

{¶ 8}   Leanna testified that she recalled seeing appellant come out of the bar and say something to Kory. She could not remember exactly what appellant said, but described his words as "like poking at someone, like some type of fighting words." Both Kory and Leanna stood up. Leanna explained, "[I] notice that there was going to be some type of pushing, shoving. * * * I went to put my arm out to stop that, um, and by the time that I had turned back, didn't even feel anything, um, Kory grabbed my arm, put it in the air. I was bleeding all down." Friends called 911. A few minutes later, police arrived. An ambulance arrived shortly thereafter. They wrapped the wound and transported Leanna to the hospital.

{¶ 9}   The emergency room doctor testified that he could not tell by looking at the wound whether it was caused by glass or a knife. However, he stated that the nurse's notes indicated that Leanna self-reported that she had been cut by a knife. Medical records from Leanna's August 8, 2015 visit to the emergency room at Amherst Health Center, reveal the laceration on Leanna's left forearm was 10 cm long and required 42 sutures in multiple layers of skin.

{¶ 10}  At trial, Leanna testified that she had never seen or spoken to appellant before the altercation outside the bar. She did not even recall seeing him inside.

{¶ 11}  During cross-examination, Leanna indicated that she was unsure what had cut her arm. She never saw a knife.

{¶ 12}  Carolyn Ann Thayer is a bartender at Rudy's. Thayer was behind the bar on the evening of August 7, 2015, and into the early morning hours of August 8, 2015. Thayer testified that she had worked at the bar for ten years, but had never seen nor met appellant before that evening. She described appellant as "very non-threatening looking * * * normal summertime guy."

{¶ 13}  Towards the end of the night, appellant became drunk; so drunk, that Thayer "cut[] him off." Thayer opined that appellant did not like being cut off. She recalled appellant making a derogatory comment towards her. She explained, "I kind of joked and laughed it off, and he said another comment to me and I

ended up saying, well, my husband, who is in the Marine Corps, probably wouldn't appreciate the way you're speaking to me."

{¶ 14}  Derrick Dillon is a bouncer at Rudy's. Dillon testified that in the early morning hours of August 8, 2015, he witnessed a man being rude to one of the bartenders. He asked the man to leave and escorted him to the door, without incident. A minute or two after the man left, Dillon looked out the window and noticed an altercation in front of the bar. He went outside. Kory and the man Dillon had just escorted out the door were pushing and shoving each other. He saw a woman, later identified as Leanna, "try to grab Kory away to stop or to get him to not do anything."

{¶ 15}  Dillon went outside. He saw blood on the ground. Leanna was standing nearby holding her arm. Dillon explained,

> I looked back and I saw a guy with blood on his shirt and reaching or putting something in his back pocket. Then me and Nick [West] went to follow the guy because he was walking down the street. I got probably 10 feet away, I stopped. I told Nick to follow the guy and I went back to help the girl. * * * She had a pretty serious cut on her arm and I had — I ran back in to get some towels. I tied one towel around her arm, had her hold it above her head, and I covered her arm with another two or three towels just to try to stop the bleeding.

{¶ 16}  On cross-examination, Dillon explained that before he witnessed appellant put something in his back pocket, appellant made "some type of flipping motion with his hands." Dillon admitted that the item in the man's hand could have been a wallet. He did not see a blade.

{¶ 17}  Nicholas West works the door at Rudy's. West testified that in the early morning hours of August 8, 2015, there were almost 100 people inside the bar. At some point, he noticed some "commotion" on the floor. The bouncer, Derrick Dillon, looked at West and indicated that he was escorting a man[1] out. According to West, the man walked past him and out of the bar without creating a "fuss." Moments later, however, West heard a commotion outside. West went out and saw a man and a woman. The woman's arm was bleeding. When West asked the couple what had happened, the couple "pointed to [the man he had escorted out the door] and said that he had stabbed the victim." West yelled into the bar, instructing his co-workers to call 911. West continued:

> I saw him over there. I said, you got to come back. The cops are on their way. You got to talk to 'em. He said, I didn't do anything. I said, well, they're saying that you stabbed her. You got to come back and talk to 'em. At that point [the man] took off walking down the street.

---

[1] When asked to identify the man that was the subject of his testimony, West identified a person sitting in the gallery of the courtroom. He did not identify appellant.

West testified that he and a few other people followed the man down the street. While everyone was walking, West saw something in the man's hand and confronted him. As the man pushed West, something came out of the man's hand. West and the others continued to follow the man. One of the people with West exclaimed, "you've got blood all over your shirt." According to West, the man then took off his shirt and "threw it over to the side and said, I don't have anything on my shirt."

{¶ 18}  At trial, West was asked to identify what was in the man's hand. West responded, "I saw him with something in his hand that looked like a knife. * * * That's what I thought was tossed when he pushed me." After the police arrived, West tried to explain to the officers what had happened. According to West, "[a]t that point the defendant came at me again and that's when the officer tackled him."

{¶ 19}  Vermilion police officer Aaron Bolton was the first officer to respond to the scene. Bolton testified that when he arrived, appellant was surrounded by a small group of people down the street from Rudy's. The jury was shown footage from Bolton's body camera depicting Bolton's arrival and Bolton's questioning of appellant, bystanders, Kory, and Leanna. According to Bolton, none of the bystanders saw how the altercation between appellant and Kory started, but one bystander reported that he saw appellant close his knife and slip it into his back pocket. Another bystander reported that appellant had been wearing a sweatshirt, the sweatshirt was covered in blood, and that appellant had thrown the sweatshirt behind a nearby lamppost before police arrived.

{¶ 20}  Bolton testified that initially, it was unclear how Leanna sustained the injury on her arm; some at the scene suggested the injury was caused by a knife, some indicated it was caused by a beer bottle. Bolton did not recall seeing any half broken beer bottles in the area. He did recall seeing "little pieces," "shards," and "chunks" of glass on the ground.

{¶ 21}  Bolton described the victim as "stunned" by the incident. He explained that he and his fellow officers were unable to get pictures of the injury before she was taken to the hospital by ambulance because the arm was wrapped in towels. Bolton did, however, receive pictures of the injury from the victim after it was sutured. These photos were shown to the jury.

{¶ 22}  Scott Holmes is a sergeant with the Vermilion Police Department. He handles Miro, the department's dual purpose K-9. Sergeant Holmes testified that Miro's primary function is narcotics detection, but he is also certified as "patrol dog" used for tasks such as criminal apprehension, searches, tracking, and handler protection. When Sergeant Holmes arrived on the scene, he instructed Miro to search. Miro is trained to search for items that have fresh human scent attached to them.

{¶ 23}  Jeff Chandler is a sergeant with the City of Vermilion Police Department. Sergeant Chandler testified that upon his arrival at the scene, he was instructed to stay with appellant while other officers questioned witnesses. Sergeant Chandler explained that while he was standing with appellant, a group of gentlemen stood nearby. Everyone was talking, telling their side of the story. "Suddenly," Sergeant Chandler explained, "[appellant] pushed one of the gentlemen, I believe it was Nick West, pushed him backwards. * * * At that time I took [appellant] to the ground and Sergeant Bolton helped me and we got him cuffed and then we placed him in the cruiser."

{¶ 24}  Sergeant Chandler indicated that once appellant was in the cruiser, he questioned appellant about the knife and its location. Appellant started talking, instead, about his version of events. Sergeant Chandler testified:

A. I get him out of the car and I ask him if he can remember or show me where he discarded the knife at, and he says he — he was on the corner. He said something about the sewers. We checked the sewers. There was no knife. And then he was asking where the bar was in relation to where he was at now, and I pointed up the road to where the bar was and where we apprehended him at. He just said he couldn't remember where it was or * * * what had happened with it. So he was taken back over and seated in the cruiser.

{¶ 25}  After 10-15 minutes of searching, Miro alerted at a patch of sunflowers. There, officers found appellant's black handled SOG folding knife with a locking mechanism. The blade of the knife was in a "closed position."

{¶ 26}  At trial, Sergeant Chandler showed the blade to the jury. He explained that the knife is "referred to as a SOG Flash." When asked to explain what the name means, Sergeant Chandler said, "I don't know for sure, but you can open it fast." Next, the prosecutor handed Sergeant Chandler the sweatshirt found at the scene. The following dialog occurred:

Q. Do you notice anything about that sweatshirt?

A. The blood pattern.

Q. What is that?

A. It looks like the shirt was used to wipe something off. * * * The pattern on the shirt looks as if the knife possibly had been wiped off with the shirt.

Q. Now, I know you don't want to open this knife, Sergeant, but I'm going to have to ask you * * * to do that. * * * Can you lay the blade of that knife on that sweatshirt in the part that you were testifying looks like it had been wiped off or smeared?

A. Right in there.

Q. Do you see anything about that?

8

A. It pretty — pretty much matches or closely resembles the blade and part of the knife, as well as up in this area here where the knife would be wiped, and it goes down the shirt. The pattern travels across the shirt.[2]

{¶ 27}  During cross-examination, questioning again turned to the sweatshirt. The following exchange occurred between defense counsel and Sergeant Chandler:

Q. All right. So let's talk about this knife and the spatter patterns on the sweatshirt, okay? Now, you were showing the jury how you felt that this pattern meant to essentially almost my client wiping the blade, correct?

A. Resembling it, yes.

Q. Resembling that, correct? You can't say for sure, can you? You can't —

A. No.

Q. — say for sure, but I want to bring your attention over here to this. Now, you've identified — you've — you've come on the stand here and you've said that you believe that this to be him wiping blood, correct?

A. Correct.

Q. Can you tell me what kind of spatter pattern this is?

A. I do not know.

Q. Do you know if it's — so you can't tell whether it's an arterial spatter pattern?

A. No.

Q. You cannot tell this jury because you're not trained in that kind of investigation as to blood splatter, correct?

A. As to spatter, correct.

* * *

Q. So you can't say within any degree of reasonable scientific certainty how this blood got there and — and what direction, directionality it got on there —

A. No.

{¶ 28}  Linda Eveleth is employed by the Ohio Bureau of Criminal Investigations ("BCI") in the Laboratory Division. She holds a Bachelor of Science and a Master of Science in biology. At trial, she was "identified and qualified as an expert in the testimony concerning the DNA analysis and biological fluid analysis." Ms. Eveleth testified that the tip of the blade of the knife was tested. No blood was identified. However, a DNA profile was obtained and it was consistent with Leanna's DNA. Ms. Eveleth further testified that a cutting from the stain on appellant's sweatshirt was tested. The results indicate that the stain was "probably blood" and that the DNA profile obtained from the cutting was consistent with Leanna's DNA.

---

[2] Photos of the knife and sweatshirt are included in the BCI report. A photo of the back of the sweatshirt depicts dark stains in various locations. It is not clear from the record what portions of the sweatshirt Sergeant Chandler was referencing in his testimony as matching or closely resembling the blade and part of the knife.

{¶ 29}  Appellant testified that he walked to Rudy's bar with two friends around 9:30 p.m. on August 7, 2015. They played pool and had some drinks. At some point in the evening, appellant's friends left. Appellant stayed to have a few more drinks. When he went to sit down at the bar, he noticed a woman a few seats down. It was Leanna. Appellant explained, "when I ordered my drink, I also told the bartender that if [Leanna] would like anything that I could — I would pay for it, if she wanted." Moments later, a man sat down next to Leanna. It was Kory. Leanna responded to appellant's drink offer by saying "my husband is a Marine." Appellant explained, "I scoffed and said, oh, the Marines."

{¶ 30}  Appellant testified that earlier in the evening, one of his friends had informed him that Kory was "a local" that had used his status as a Marine to "instigate fights." Appellant admitted that he should have known Kory was "someone to avoid in that circumstance specifically with regard to * * * the subject of a Marine."

{¶ 31}  Appellant indicated that when he left the bar around 1:30 a.m., three men were standing directly in front of him. He noticed Kory sitting on a bench with Leanna. Appellant explained,

> I was fishing a cigarette to have on my walk, and I noticed [the] three men * * * stopped talking and turned and advanced towards me. One of them was — one of them chucked a cigarette like at my feet, and I — and I had — at that time I was pretty apprehensive as to what was going to happen, um, because I had recognized them before, and so the only person that I knew that I thought I could diffuse the situation, um, being that he must know a Marine and he knows my friend, who's also a Marine, was to turn and ask, and the question I asked was: Do you think it's ok to threaten people because you are a Marine? * * *
>
> Well, at that point I was pretty apprehensive what was gonna happen, and like I said, I made that statement, and then Mr. Herchler got straight up and he said that he was going to kick my ass, and at that point I — I knew that all my options basically were gone and — and that if I wasn't gonna get a punch this way, I was just gonna get hit this way from Kory.

{¶ 32}  According to appellant, as soon as Kory stood up, appellant pulled his hands out of his pockets, his keys were in his left hand and his knife was in his right hand. He placed both hands on Kory's chest and tried to throw him into the group of men. Appellant recalled falling backwards. By the time appellant stood up, Leanna and Kory were gone, but the three men were still there. Appellant started walking away from the men, backwards. At that point, someone walked out of the bar and stated that Leanna had been cut. The three men went inside the bar.

{¶ 33}  At trial, appellant explained that during the summer he usually kept his

knife in his pocket. He used it for his work at a marina. Appellant stated, "I knew that I had my knife and that it was possible that I could have cut her." He explained, "So I go back to Rudy's. I'm walking back to Rudy's I'm looking at my knife and I'm like looking at it. I open it a couple times. I look around in front of Rudy's. I'm checking to see if there's anything on it. There's nothing on it." Then, according to appellant, someone walked out of the bar and accused him of having a knife. More people started coming out of the bar. Then, someone accused appellant of having blood on the back of his sweatshirt. So, appellant took off his sweatshirt to see what people were talking about. When he looked at the back of his sweatshirt, he noticed the blood. For a moment, he thought that perhaps, he too was injured. Appellant soon realized he wasn't.

{¶ 34}  Appellant started walking away, again. Someone said they had called the police. Appellant set the sweatshirt next to a lamppost. Appellant's confusion led to frustration. By the time the police arrived, appellant tossed the knife down by some sunflowers.

{¶ 35}  At trial, appellant was adamant he did not cut Leanna:
    Q. You have a lot of reasons not to tell the truth here? Why should these people believe you?
    A. Because I didn't cut Leanna.
    Q. You just said you didn't know if you did.
    A. I believe I did not cut Leanna.
    Q. Did your knife ever open? Did you ever see your knife open during the course of that evening?
    A. No.
    Q. Did you ever brandish your knife at anyone else?
    A. No.
    Q. As that mob moved towards you, did you pull that knife out, open it up, and show it to them?
    A. No.
    Q. You ever stab somebody before?
    A. No.
    Q. Ever cut somebody with your knife before?
    A. No.

*State v. Bartulica*, 2018-Ohio-3978, ¶¶ 4-35; ECF Doc. 6-11 at 3-8.  These state court factual findings are presumed to be correct unless Bartulica rebuts them by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Moore v. Mitchell,* 708 F.3d 760 (6th Cir. 2013).

### III.    Law and Analysis

To obtain a writ of habeas corpus, Bartulica must show that he is "in custody in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).  Additionally, Bartulica must show that each claim he presents meets all the jurisdictional and procedural requirements to obtain merits review by the federal habeas court.  *See*, *e.g.*, 28 U.S.C. § 2254(b) (exhaustion); 28 U.S.C. § 2244(d) (statute of limitations).  Bartulica asserts, and respondent has not disagreed, that one who is sentenced to serve a period of community control following a conviction meets the "in custody" requirement of the habeas statute.  I agree that because Bartulica was on community control when he filed his habeas petition, he meets the "in custody" requirement of the statute.  *Jones v. Cunningham*, 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); *Hautzenroeder v. Dewine*, 887 F.3d 737, 740 (6th Cir. 2018).[3]

### A.    Ground One:  Sufficiency of Evidence

In his Ground One claim, Bartulica argues two points: (1) there was insufficient evidence that his knife was a deadly weapon (or was used as a deadly weapon), an essential element of the Count Two felonious assault charge; and (2) there was insufficient evidence that he acted knowingly, as required in both the Count One and Count Two felonious assault charges and the Count Three Assault charge.  ECF Doc. 2-1 at 17, 20.  Respondent Voltz responds that the Ohio Court of Appeals, applying the same standard as the clearly established United States Supreme Court law, reasonably determined that a rational trier of act could find Bartulica guilty.  ECF Doc. 6 at 21, 25.

---

[3] Voltz has not commented on the timeliness of Bartulica's petition.  Under 28 U.S.C. § 2244(d)(1)(A), the one-year statute of limitations would expire one year after Bartulica's petition for writ of certiorari was due in the United States Supreme Court.  *Bronaugh v. Ohio*, 235 F.3d 280, 283-84 (6th Cir. 2000).  Because Bartulica filed his petition one year after the Ohio Supreme Court declined to accept jurisdiction of his appeal, his petition is timely.

### 1.      Lack of Jurisdiction

This court has no jurisdiction to determine whether sufficient evidence supported a finding that his knife was a deadly weapon – a necessary element of the felonious assault charged in Count Two only.  We have jurisdiction only to entertain claims raising challenges to convictions for which the petitioner is in state custody.  28 U.S.C. § 2254(a); *Maleng v. Cook*, 490 U.S. 488, 490-91 (1989); *Bowling v. White*, 694 F. App'x 1008, 1011 (6th Cir. 2017).  But there's the rub – Bartulica isn't in custody pursuant to a *conviction* for the felonious assault charge alleged in Count Two of the indictment.  Under Ohio law, a "conviction" occurs only when a defendant is both adjudged guilty of an offense *and* sentenced for that offense.  *Smith v. Coleman*, 521 F. App'x 444, 449 (6th Cir. 2013) (citing *State v. McGuire*, 80 Ohio St. 3d 390 (Ohio 1997)).  Because Bartulica's Count Two offense was merged with his Count One felonious assault charge, no sentence was ever imposed on Count Two, and, thus he was never "convicted" of "causing or attempting to cause physical harm to another . . . by means of a deadly weapon."  ECF Doc. 6-7 at 4.  Thus, Bartulica is not "in custody" for the deadly weapon version of the felonious assault charges he faced.  28 U.S.C. § 2254(a); *Maleng*, 490 U.S. at 490-91.

Accordingly, to the extent Bartulica's Ground One claim challenges the sufficiency of the evidence that his knife was – or was used as – a deadly weapon, his Ground One claim must be DISMISSED in PART for lack of jurisdiction.

### 2.      Merits

In the second part of his Ground One claim, Bartulica challenges the sufficiency of the evidence that "knowingly" caused physical harm to Leanna Griebe.[4]  Bartulica raised this claim

---

[4] Proof of knowing action is also required for the Count Three misdemeanor assault charge, but Bartulica did not mention Count Three in his direct appeal or in his appeal to the Ohio Supreme Court.  And he has

on direct appeal to the Ohio Court of Appeals, and though he expressed it somewhat differently on his appeal to the Ohio Supreme Court, Respondent Voltz has not contended that the claim was unexhausted or procedurally defaulted as a result.  I find that Bartulica did fairly present a federal constitutional challenge to the sufficiency of the evidence that he acted knowingly in causing physical harm to Leanna Griebe in the Ohio Court of Appeals and the Ohio Supreme Court.  Thus, he exhausted his ability to present such a claim for review in the Ohio courts and is eligible for review of that claim in our court under 28 U.S.C. § 2254.

When a criminal defendant alleges that the trial evidence was insufficient to support his conviction, the court must determine whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The sufficiency-of-the-evidence determination is based on *all* of the evidence, even evidence that was erroneously admitted.  *McDaniel v. Brown*, 558 U.S. 120, 131 (2010).  And when the sufficiency-of-the-evidence standard is filtered through the Antiterrorism and Effective Death Penalty Act's ("AEDPA") deferential standard, a federal habeas court must apply "double deference" – first to the jury's verdict and second to the state courts' later consideration of that verdict.  *Davis v. Lafler*, 658 F.3d 525, 531-35 (6th Cir. 2011) (*en banc*); *see also* 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 88, 98-99, 102-03 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.").  In other words, a federal habeas court must deny habeas relief

---

not mentioned Count Tree in his habeas petition.  Thus, any challenge to his conviction on Count Three was not exhausted in state court and because his time to raises such a challenge has now expired it is procedurally defaulted.  By not raising any claim respecting Count Three in his habeas petition, Bartulica has forfeited it by allowing the statute of limitations on the claim to expire.

so long as the state court *reasonably* determined that a *reasonable* juror could have found the essential elements of the offense from the evidence in the record beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319; *Davis*, 658 F.3d at 531-35.

The Ohio Court of Appeals reasonably concluded that the jury reasonably concluded that the state presented sufficient evidence to support a finding that Bartulica acted knowingly in causing physical harm to Leanna Griebe,[5] thereby meeting the element of the Count One felonious assault charge Bartulica challenges.  *Jackson*, 443 U.S. at 319; *Davis*, 658 F.3d at 531-35; 28 U.S.C. § 2254(d).  As explained by the Ohio Court of Appeals, it was reasonable for the jury to find that Bartulica knowingly caused physical harm to Leanna Griebe based on: (1) evidence that Bartulica confronted Kory Herchler in front of the bar while holding a knife; (2) Bartulica's testimony that he had both fists pushed against Herchler's chest when he tried to throw Herchler into a group of men during the confrontation; and (3) witness testimony that the injury occurred when Griebe pushed Bartulica away from Herchler.  ECF Doc. 6-11 at 9; *Bartulica*, 2018-Ohio-3978 at ¶ 50.  The court of appeals acknowledged Bartulica's testimony that the knife was closed but concluded, "If the jury found [Bartulica's] testimony incredible, then it could infer that Bartulica acted knowingly."  *Id.*  In other words, the jury could infer that Bartulica was not telling the truth when he said the knife was closed.  And if they did, they could conclude that the knife was open; and that would permit the justifiable inference that he acted knowingly.  *See State v. McArver*, No. 92AP-1148, 1993 Ohio App. LEXIS 496, at *5 (Ohio App. Ct. Jan. 26, 1993) ("[T]he jury may choose to disbelieve [a defendant] and conclude that the truth is the opposite of how he testified."); *State v. Thompson*, No. 92AP-1124, 1993 Ohio

---

[5] Bartulica could have made the same argument respecting the misdemeanor assault offense charged in Count Three because it too required proof that he acted knowingly.  But he has not asserted such a claim in this court or in his direct appeal.

App. LEXIS 1198, at *10 (Ohio App. Ct. Feb. 23, 1993) (same); *accord United States v. Mazyck*, No. , 1988 U.S. App. LEXIS 9251, at *6 (6th Cir. 1988) ("[The defendant's] story was so implausible that it would have been perfectly appropriate for a jury to refuse to believe his story, and even to conclude that 'the opposite of his testimony is the truth.' *United States v. Kenny*, 645 F.2d 1323, 1346 (9th Cir.), cert. denied, 454 U.S. 828 (1981).")

And these findings must be read in context with the appellate court's findings in overruling other parts of Bartulica's evidence sufficiency challenge, including: (1) that the state presented evidence of a fact in dispute – whether the knife was open when Bartulica confronted Herchler – including the circumstantial evidence of: (i) the wound itself; (ii) the movements leading to the wound; (iii) Griebe's DNA on the knife blade; (iv) and Bartulica's admission that he opened the blade after the confrontation to look for blood. ECF Doc. 6-11 at 9; *Bartulica*, 2018-Ohio-3978 at ¶ 44. *See also* Ohio Rev. Code § 2903.11(A) (requiring proof that the accused acted "knowingly" in causing the physical harm required to establish felonious assault); Ohio Rev. Code § 2901.22(B) (defining what it means to act "knowingly" under the Ohio criminal code).

Even though other evidence – including Bartulica's testimony – could have conflicted with a finding that Bartulica acted knowingly in causing physical harm to Griebe, the jury was free to disbelieve any testimony (or other evidence) that it didn't think was credible. *See Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) ("It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony."). And this court must assume that the jury resolved any such inconsistencies in favor of the jury's verdicts. *Jackson*, 443 U.S. at 319. Further, the Ohio Court of Appeals applied a standard consistent with *Jackson* in finding that the jury reasonably determined Bartulica had the requisite scienter for his Count One felonious assault conviction. *Compare:* ECF Doc. 6-11 at 8, *Bartulica* 2018-Ohio-

16

3978, ¶ 38, *with Jackson*, 443 U.S. at 319; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (The state court doesn't have to cite the federal standard, so long as the rule it applied is consistent with the federal standard.)

Bartulica has repeated in our court the same claim he made in the Ohio Supreme Court: that in essence, the Ohio Court of Appeals speciously concluded that the mere possession of a knife during an altercation is sufficient to prove that the defendant knowingly committed felonious assault.  ECF Doc. 2-1 at 22.  That contention is predicated on Bartulica's version of events – that his knife was closed and that he didn't later try to conceal the knife to hide what he'd done – being accepted as the only reasonable conclusion that could have been reached by the jury.  The trial record, however, plainly shows that was not the only conclusion the jury could have drawn.  As the Ohio Court of Appeals reasonably concluded, there was ample evidence upon which a reasonable juror could have found Bartulica guilty of felonious assault.  We must defer to the findings of the jury and the Ohio Court of Appeals.

Because Bartulica has not shown that the Ohio Court of Appeals made an unreasonable determination of fact or applied a standard inconsistent with Supreme Court precedent, he cannot meet his burden to show that he is entitled to habeas relief on his Ground One evidence sufficiency claim.  28 U.S.C. § 2254(d).  I recommend that Bartulica's Ground One claim be DISMISSED as meritless.

**B.    Ground Two:  Admission of Police Sergeant Testimony**

Bartulica's Ground Two claim asserts that he was denied due process of law and a fair trial when the trial court improperly admitted the "expert" testimony of Vermilion police sergeant  Jeff Chandler.  Bartulica acknowledges that habeas courts cannot reexamine state-court determinations on state-law questions, but he correctly points out that a habeas petitioner can be entitled to relief if the misapplication of state evidentiary rules resulted in the denial of

fundamental fairness, which is a violation of due process of law, citing *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000).  ECF Doc. 2-1 at 24.

Respondent Voltz argues that we are generally prohibited from granting merits review of state court rulings on the admissibility of evidence, citing *Buell v. Mitchell*, 274 F.3d 337, 357 (6th Cir. 2001).  But she too acknowledges that such claims can be reviewed when there has been a denial of a fundamentally fair trial.  Voltz cites *Cooper v. Sowders*, 837 F.3d 284, 286 (6th Cir. 1988).  ECF Doc. 6 at 30.  And she draws our attention to the following general statement of the applicable standard announced by the Sixth Circuit: "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000), which cited *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2016, 135 L.Ed.2d 361 (1996)[6].  ECF Doc. 6 at 30.

Thus, both Bartulica and Voltz agree on the general proposition that we can only review claims premised on state-law evidentiary rulings when the fundamental fairness of the petitioner's state proceedings is challenged.  And if Bartulica can't meet his burden to show that a principle of fundamental fairness was violated, his Ground Two due process claim is noncognizable.  *See Bell v. Sheldon*, No. 1:09-cv-1884, 2010 U.S. Dist. LEXIS 134849, at *22 (N.D. Ohio Sept. 24, 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007)).  The question, then, is how do we assess whether Bartulica was denied a fundamentally fair trial?

---

[6] My habeas decisions normally include the following statement on the fundamental fairness issue: Fundamental fairness under the Due Process Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted).  Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'"  *Id.* (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).  Given the parties' agreement on the applicable principles of law, there is no need to belabor the point.

The Sixth Circuit's approach to this issue is found in Bartulica's cited case: "Assuming arguendo that the trial court did err in admitting Dr. Shaler's testimony . . . [w]hether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Brown*, 227 F.3d at 645 (citations and internal quotation marks omitted).  And the way the Sixth Circuit answered its own question was to focus on the fact that, "The Supreme Court of Kentucky twice concluded that even without Dr. Shaler's testimony, the evidence presented against Petitioner was sufficient to justify his conviction and that Petitioner had not been denied a fair trial."  *Id.*  This is the equivalent of "prejudice" analysis; in other words, if the properly admitted evidence was sufficient to convict, then the habeas petitioner would not have been denied a fair trial, because he was not prejudiced by the admission of the challenged evidence.

Here, Bartulica and Voltz devote page upon page of their briefs debating whether the trial court and the Ohio Court of Appeals correctly analyzed the Ohio Rules of Evidence and the state's compliance with the rules of criminal procedure.  But we need not referee that dispute. Instead, we can simply return to the Ohio Court of Appeals' analysis of Bartulica's three-part felonious assault evidence sufficiency challenge.  In its entire discussion of the sufficiency of the evidence to support Bartulica's felonious assault convictions (it discussed Count One and Count Two together), the court never mentioned Sergeant Chandler's challenged testimony.  Thus, by finding that there was sufficient evidence to support Bartulica's convictions for felonious assault without mention of Sergeant Chandler's testimony about the blood on Bartulica's sweatshirt, the appellate court necessarily implied that Chandler's testimony was not "evidence [that was] material in the sense of [being] a crucial, critical highly significant factor."  *Brown*, 227 F.3d at 645.  The admission of the Chandler opinion testimony did not deprive Bartulica of a fundamentally fair trial.

19

The finding that Bartulica was not denied a fundamentally fair trial, forces the conclusion that Bartulica's Ground Two claim cannot be addressed on the merits in this court.  The claim raises only noncognizable arguments concerning the interpretation and application of Ohio law.  Simply stated, the Ground Two claim challenges how the trial court and Ohio Court of Appeals dealt with Sergeant Chandler's testimony under Ohio Evidence Rule 701.

Bartulica contends that when Chandler testified that Bartulica's sweatshirt looked like he had wiped blood off of a knife blade using the shirt, he actually offered expert opinion testimony.  And he argues that because Chandler was not qualified as an expert under Ohio Evidence Rule 702, he should not have been allowed to offer the opinion.  Bartulica also argues that even if Chandler's testimony was arguably admissible as lay opinion under Ohio Evidence Rule 701, the state failed to offer any evidence that Chandler had the background, experience, or qualifications to offer such an opinion; and he contends the Ohio courts erred by not excluding that evidence.  That the Ground Two claim raises only state law issues is demonstrated by the fact that Bartulica did not include a single citation to federal law in presenting the claim to the Ohio Court of Appeals.  ECF Doc. 6-9 at 27-34.[7]

Because Bartulica's Ground Two claim only alleges trial court error based on violations of state evidentiary rules and case law, the claims is not cognizable.  Moreover, Bartulica has not demonstrated that the challenged rulings resulted in a denial of fundamental fairness.  I recommend that Bartulica's Ground Two claim be dismissed as non-cognizable.

---

[7] Bartulica's failure to present the claim as a federal law claim in the Ohio Court of Appeals means the claim was not fairly presented, even though he offered federal law arguments to support the claim in his Ohio Supreme Court jurisdictional memorandum.  And failure to fairly present the claim means the claim was not exhausted, as required by 28 U.S.C. § 2254(b)(1)(A).  Because Bartulica can no longer raise the claim on direct appeal in the Ohio Court of Appeals, it is procedurally defaulted.  *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010); *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Respondent Voltz has not argued that the Ground Two claim was procedurally defaulted; and we need not dispose of the claim on that basis because the claim is noncognizable in any event.

**IV.** **Certificate of Appealability**

    **A.** **Legal Standard**

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks the requirement of 28 U.S.C. § 2253(c)(3) that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)."  Rule 11(a).  In light of the Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

Under 28 U.S.C. § 2253(c)(1)(A), this court will grant a COA for an issue raised in a § 2254 petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right.  *See Cunningham v. Shoop,* 817 F. App'x 223, 224 (6th Cir. Aug 24, 2020). A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck v. Davis,* 137 S. Ct. 759, 773 (2017) (quoting *Miller-El v. Cockrell,* 537 U.S. 322, 327, 336 (2003)); *see also Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  When a claim is denied on procedural grounds, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack,* 529 U.S. at 484.

    **B.** **Analysis**

If the Court accepts my recommendations, Bartulica will not be able to show that the Court's rulings on his claims are debatable among jurists of reason.  Bartulica's Ground One

claim lacks merit in part and it beyond our jurisdiction in part; and his Ground Two claim is noncognizable.  Because jurists of reason would not find debatable that habeas relief is not available for either of Bartulica's claims for relief, I recommend that the Court decline to issue a certificate of appealability.

## V.    Recommendations

Because this court lacks jurisdiction to consider Bartulica's Ground One claim in part, I recommend that Ground One, to the extent it challenges his guilty verdict on Count Two of the state court indictment, be DISMISSED IN PART for lack of jurisdiction.  To the extent Bartulica's Ground One claim challenges his conviction on Count One of the state court indictment, the claim lacks merit and I recommend it be DISMISSED IN PART for lack of merit. Because Bartulica's Ground Two claim raises only noncognizable issues of state law, I recommend it be DISMISSED.  I further recommend that Bartulica's petition for writ of habeas corpus be DENIED.  Finally, I recommend that Bartulica not be granted a certificate of appealability.

Dated: July 26, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).